8509

PRATER v. PRATER.

1. CONTRACTS—PERSONAL SERVICE.—Where a father makes a contract with his son and wife for their personal services and the society, companionship and services of the son is an essential part of the consideration, the death of the son absolves the father from carrying out the contract.

2. IBID.—WAIVER.—But where the father, after the death of the son, accepts the services of the wife from August until the following January without notice that he elects to treat the contract as ended, he waives the right to do so.

3. IBID.—Under the proof in this case, it is held the wife breached the contract after waiver of the father to end it, but that she and her husband are entitled to compensation for the services rendered up to the death of the son.

Before PRINCE, J., Saluda, August, 1912.    Affirmed.

Action by Mary E. Prater *et al.* against Dollie E. Prater *et al.* Plaintiffs appeal.

The Circuit decree is:

"This is a suit in equity brought by the plaintiffs to compel the defendants, Dollie E. Prater, individually, and James M. Prater, in his own right and as executor of the last will of M. A. Prater, deceased, to specifically perform an agreement alleged to have been made between the said M. A. Prater and the plaintiff, Mary R. Prater, and her husband, Drayton Prater; now deceased, wherein and whereby it was agreed that if the plaintiff, Mary R. Prater, and her husband would come and live with the said M. A. Prater as long as he lived, the said M. A. Prater would will to them all of his property at his death.

"Briefly stated, the complaint alleges that on the 23d day of November, 1903, and prior thereto, and for a short time subsequent thereto, the plaintiff, Mary R. Prater, and her husband, Drayton Prater, were living in the city of Augusta, Georgia, engaged in a prosperous business, conducting a hotel, or boarding house, and were reasonably contented with their lot. That in pursuance of a letter written by M. A. Prater to Mary R. Prater, the same being fully hereinafter set out, and relying upon the promises and inducements therein contained, and at a financial and personal sacrifice, the plaintiff, Mary R. Prater, and her husband, Drayton Prater, broke up their home and business in the city of Augusta and went and lived with and cared for M. A. Prater as long as the said Drayton Prater lived; and that the plaintiff, Mary R. Prater, after the death of her husband, Drayton Prater, continued to live with and care for the said M. A. Prater until forced by him to leave his premises, his conduct making it impossible for her to continue to perform her part of the contract. That the said M. A. Prater died June 6, 1909, failing to carry out his contract, bequeathing and devising all his property to the defendants herein. That Drayton Prater had previously deceased, his father, the said M. A. Prater, dying on or about August ————, 1905, leaving as his heirs at law his widow, the plaintiff,

Mary R. Prater, and his children, the other plaintiffs herein. The complaint prays that it be decreed that the said M. A. Prater was legally bound to devise and bequeath his property to the plaintiffs and that said contract be enforced, the defendants being required to make the conveyance of all the property of which the said M. A. Prater died seized and possessed to these plaintiffs and account to them for all rents and profits thereof since the death of the said M. A. Prater, and all moneys and personal properties received by them from the said estate.

"The complaint alleges that the plaintiff, Mary R. Prater, and her husband, Drayton Prater, who was a son of M. A. Prater, were induced to break up their home and business in the city of Augusta, State of Georgia, and take up their abode at the residence of the said M. A. Prater in the county of Saluda, State of South Carolina, to stay with him as long as the said M. A. Prater should live, in order that the said M. A. Prater might enjoy the companionship and society of the plaintiff and her husband, Drayton Prater, as well as might receive their care, attention, help and services, as the said M. A. Prater was at the time living alone and was desirous of the companionship, society, help and services of the plaintiff and her husband. And, as an inducement to the said Mary R. Prater and her said husband to break up their home and go and live with him and give him their companionship, society, help and services, the said M. A. Prater promised the said plaintiff and her husband, and obligated himself to them, to devise and bequeath unto them absolutely all his estate, real and personal, at his death. It is further alleged that, accepting the proposition made to them by her father-in-law, M. A. Prater, the plaintiff, Mary R. Prater, and her husband, Drayton Prater, did remove from their home in the city of Augusta to the home of M. A. Prater in the county of Saluda, South Carolina, and did give him the benefit of their companionship, society, help and personal services as long as Drayton Prater lived.

"The defendants make a general denial and allege, affirmatively, that M. A. Prater performed his part of said agreement, and that the same was breached by the plaintiff, Mary R. Prater. That the alleged contract was made with the view of a personal performance of the same by Drayton Prater, which could be performed by him only, and his death before the completion of said contract, during the life of M. A. Prater, discharged the same and absolved the said M. A. Prater from carrying out its provisions. They plead the statute of frauds, in that the agreement was not in writing and that the same was not to be performed in one year; that the contract was for the sale of personal property for more than fifty dollars in value.

"The plaintiffs have undertaken to sustain their action by the introduction of a certain letter alleged to have been written by the deceased, M. A. Prater, and, as upon the construction of this letter the proper adjudication of this case will so largely depend, I deem it best to set it out in full, as follows, to wit:

"Batesburg, S. C., November 23, 1903. Mary, my dear children: I will write you a letter it seems that you and Drayton ar not living like you ought to   now take a fathers advice get together and live write    Drayton wants come home and live with me Mary I   have tuck the notion   that I want you to come and keep. house for me and will give Dration and the boys a one horse farm free of rent I think you ought to come with him to take care of the property when I am gone   if you and will come and tay with me as long as i live I will all of my property to you and him at my death if I have no bad luck I will leave money enough to by you and Draton a home   Mary I mean what I am saying if you wont come and stay with me I will give my property to some one that will come and stay with me I cant stay by myself I rather you and Draton to have my property than anybody

els   if you wont come you will lose it so Mary I think you
will do best to come   yours as ever, M. A. Prater

Mary let me hear from you at once.'

"It is undisputed that the above letter was written by M.
A. Prater and delivered to his son, Drayton, who, it seems,
was at his father's house at the time the letter was written,
and was by Drayton carried to Augusta, Georgia, and there
delivered to his wife, Mary R. Prater.   Soon thereafter
the plaintiff, Mary R. Prater, and her husband, Drayton
Prater, abandoned their boarding house business in the city
of Augusta and moved over to the home of M. A. Prater in
the county of Saluda, South Carolina, and entered upon the
discharge of their duties incident to keeping house, farming
and otherwise caring for M. A. Prater, who was the father
of Drayton Prater, giving to him their society, companion-
ship and services.   The letter embraced the proposition on
the part of M. A. Prater, and, while Mary R. Prater cannot
testify to any comunication or transactions which she might
have had with the deceased, yet it is clear that she and her
husband left their home in the city of Augusta with the
intention of accepting the proposition contained in the letter
of M. A. Prater.   And I think from the circumstances of
the case it may be safely concluded that Mary R. Prater and
Drayton Prater did accept the proposition made by M. A.
Prater and did enter upon the discharge of their duties in
accordance with the terms set forth in the letter of M. A.
Prater.   The letter and their acceptance, therefore, being
the contract of the parties; in other words, there was an
intentional offer on one side and an intentional acceptance
on the other.

"Mr. Pomeroy, in his Equity Jurisprudence, vol. 3, sec.
1244, after treating of ordinary contracts, says: 'When an
absolute, unconditional representation of something to be
done in the future is made by one person in order to accom-
plish a particular purpose, and the person to whom it is
made, relying upon it, does the acts by which the intended

result is obtained and purpose accomplished, a contract is thereby concluded between the parties.'

"This doctrine is recognized in our own cases of *McKeegan* v. *Oneil,* 22 S. C. 468. In that case the Court says: 'To bring a case under those principles, it must appear that the party sought to be bound desired to bring about a certain result, and that in order to accomplish his purpose, he made an absolute, unconditional representation that he would do something in the future, and that the party to whom it was made, relying upon it, did the act required.' * * * 'such contracts may be established by direct proof, or inferred from a conclusion of facts from the circumstances surrounding the parties.' *Wilson* v. *Gordon,* 73 S. C. 155. I hold that the contract herein has been established.

"In this case there was an unconditional representation by M. A. Prater that he would will his property to the plaintiff, Mary R. Prater, and her husband, Drayton Prater, if they would come to his home, give him their society, companionship and services as long as he should live.

"The statute of frauds has no application in this case. A part of the contract was in writing, and there was such part performance by the plaintiff, Mary R. Prater, and her husband, Drayton Prater, as to take the case out of the statute of frauds. If the plaintiff, Mary R. Prater, and her husband, Drayton Prater, fully performed all the conditions precedent, it would be a fraud on their rights to permit M. A. Prater, if living, or his devisees, to repudiate or fail to carry out the proposition contained in his said letter. The very thing the statute of frauds was intended to prevent would result if the defendants could successfully plead the statute.

"The authorities are abundant to the effect that if the plaintiffs establish their case by the preponderance of the evidence, that specific performance will be decreed.

" 'A person may bind himself to dispose of property by will in a certain way or to certain parties, and, failing to do so, his agreement, if clearly established, may be enforced after his death against his legal representatives.' *McKeegan* v. *Oneil,* 22 S. C. 454; *Rivers* v. *Executors of Rivers,* 3 Des. 190; *Gray* v. *Exrs. of James,* 4 Des. 185; *Fogle* v. *Church,* 48 S. C. 86.

"The contract having been established and the law being that such contract when established can and will be specifically enforced in a proper case, the question arises : Have the plaintiffs shown by the greater weight of the evidence their right to have the contract herein enforced? This involves the answer to the following questions: First, was M. A. Prater absolved from carrying out the contract by the death of Drayton Prater in his lifetime?

"Second, did M. A. Prater, by allowing the plaintiff, Mary R. Prater, to continue to reside with him and render him personal services after the death of Drayton Prater, waive his right to declare the contract at end?

"Third, if M. A. Prater, by allowing Mary R. Prater to continue to reside with and serve him after the death of her husband, waived his right to end the contract, then who thereafter breached the contract, Mary R. Prater or M. A. Prater, now deceased?

"As to the first question, the general rule is that where a person absolutely contracts to do a certain thing, not impossible or unlawful at the time, he will not be excused from the obligation of the contract unless the performance is made unlawful, or is prevented by the other party. *Dexter* v. *Norton,* 47 N. Y. 62; reported in 7 Am. Rep. 415. And further, 'That contracts to perform personal services are considered as made on the implied condition that the party shall be alive and shall be capable of performing the contract, so that death or disability will operate as a discharge.' 9 Cyc. 632.

18—94

"It is fundamental that all contracts must have a consideration, and to the above rules there is this exception: That where a contract is made whereby two parties are to perform acts of personal services to another during his life, and if one of the parties contracted with should die before the death of the party to whom the services are to be given, and if the contract was not really made with the party who died or in contemplation of receiving real benefits from his services, and that the party so dying, did not constitute a substantial consideration of the contract, but the real object in view was to receive the services of the living party, then the death of the party who did not form an essential element that led to the making of the contract would not discharge the same or justify a rescission thereof by the party to whom the services were rendered.

"But if the real consideration was the services of both parties and if the services of the one dying was an essential part of the consideration, the death of such party would discharge the contract, or at least justify a rescission thereof by the other to whom the services were to be rendered.

"Whether or not Drayton's death discharged the contract or justified its rescission by M. A. Prater and thereby relieved him from the obligations to perform his part thereof, depends primarily upon the purpose and intention of the parties at the time of making the contract, and that intention has to be derived primarily from the letter, but from such letter, construed in view of all the circumstances surrounding the parties at the time which may have thrown sidelights thereon. Was the letter itself or the inducements therein contained really intended to embrace both her and her husband, and were the society, companionship and services of Drayton a substantial element of the consideration for the promises therein made, and were his services, society and companionship an essential part of the benefits which M. A. Prater were to receive, or was Dray-

ton's society, companionship and services merely an incident to a transaction had with his wife, Mary R. Prater?

"I think it is clearly shown by the greater weight of the evidence herein, and I think a proper construction of the letter itself will sustain this finding, that the enjoyment by M. A. Prater, then about eighty years of age, of the society, companionship and services of his son, Drayton, was an essential part of the consideration of the contract entered into between the parties, and that the death of Drayton was sufficient justification for the rescission of the contract by his father, M. A. Prater. Not only is this made manifest by the letter and other evidence in the cause, but it is emphasized by the complaint itself. At page 2 of the said complaint it is alleged 'that in order that the said M. A. Prater might have the enjoyment of the companionship and society of the said plaintiff and her said husband, as well as to receive their care, attention, services and help, the said M. A. Prater, at that time living alone, and desiring the said companionship, society, help and services of the said plaintiff and her said husband.'

"In the letter are these words: 'Drayton wants to come and live with me. I think you ought to come with him. If you and (evidently Drayton omitted) will come and stay with me as long as I live,' etc.

"I conclude, therefore, that the death of Drayton justified a rescission of the contract by his father. And the following is a summary of the law on the question: 'Contracts involving personal performance by either of the parties or by a third person, which can only be executed by the party individually, are subject to the implied condition that the person shall be alive and able to perform the contract.' Harrison on Contracts 184; *Spalding* v. *Rosa,* 27 Am. Rep. 10: 'Contracts for personal services are subject to this implied condition; that the person shall be able at the time to perform them, and if he dies or, without fault

on the part of the covenanter, becomes disabled, the obligation to perform becomes extinguished.'

" 'A contract whereby the promisor is to perform certain services of a personal nature and such as cannot be performed by his assignee or his successor, is discharged by the death of either party, whether the party who is to perform such services, or the party to whom such services were to be performed.' Paige on Contracts, vol. 3, p. 2116, sec. 13641.

"In *Parker* v. *McCoomber,* 16 L. R. A. 8585, we find the following language: 'The death of a woman whose services and attendance are contemplated in a contract by which she and her husband agreed to board, care for and maintain her aunt during her life, makes such a substantial failure in the consideration that the aunt is justified in rescinding the contract.'

"I might cite at length yet numerous other authorities to a like purpose, but deem it sufficient only to say that in my opinion the death of Drayton under the contract would at least justify its rescission by his father.

"Did the continuance by Mary R. Prater of her services to M. A. Prater subsequent to the death of her husband, and the acceptance of such services by M. A. Prater, amount to a waiver by him of his right to rescind the contract?

"These services were rendered by Mary and accepted by her father-in-law without any agreement or understanding other than had been entered into previous to her removal to his home. I do not think that such acceptance by him of her services after the death of her husband, without any understanding between them, amounted to waiver on his part of his right of rescission. But, grant that such acceptance of services by him amounted to such waiver, and that the original contract remained in force after the death of Drayton, who then breached the contract, M. A. Prater or Mary Prater?

"I am constrained to think, from the testimony, that the contract was breached by Mary R. Prater, if it was then still of force.

"There is testimony that Mary R. Prater made statements to various witnesses as to her intention of leaving M. A. Prater's place. The evidence discloses the fact that in October, previous to her leaving M. A. Prater, at Christmas, she was visited by her daughter-in-law, Fannie Prater, who remained as her guest in M. A. Prater's home until Christmas; that Fannie had with her an infant. It seems that M. A. Prater objected to having in his home Fannie and her child. He was certainly under no contract obligation to permit Fannie and her child to remain under his roof and eat at his table. The Court can well understand how that an old man, eighty years of age, might be very much annoyed by having a young child in his home, and the Court is not surprised that a feeble old man should so lose his temper as to throw out Fannie's trunk, as detailed in the testimony of Mary R. Prater and Fannie; nor is the Court surprised that Mary R. Prater then lost her temper because of the discourtesy on the part of her father-in-law to her daughter-in-law, Fannie, and when her father-in-law refused to leave and allow Fannie and her child to remain there, that Mary R. Prater left his home and went to Augusta. Such I find to be the fact. I find that it was the day after Christmas that Fannie and her child were driven away from his home, and that Mary R. Prater left on the 5th of January following.

"There is not a particle of competent testimony that old man Prater and Mary R. Prater had any trouble after the time that Fannie was driven off. As I have said, M. A. Prater was under no obligations to let Fannie stay there, and there might be good reasons why a man up in eighty should not wish to be bothered with a crying baby in the house.

"I am fully satisfied that when Drayton Prater and his wife, Mary R. Prater, entered into the contract with M. A.

Prater, the father of Drayton, they knew the habits and disposition of the old man, Prater, and that such knowledge became a part of the contract that under the law Mary and the other plaintiffs cannot recover, because they have not shown that they have performed the conditions precedent in this case.

"To settle a dispute between the parties as to whether the letter covered and contemplated both real and personal property, or only personal property, I am disposed to think and so hold that the letter contemplated transferring to Mary R. Prater and Drayton Prater, her husband, the entire property of M. A. Prater, both real and personal, upon the performance by them of the necessary condition precedent. But under the view that I have taken in this case this matter becomes immaterial.

"The two questions and grounds upon which the Court decides this case did not enter into the case cited by the plaintiff's counsel, and this differentiates this case from the case cited.

"The burning of the will by M. A. Prater, even if it occurred, and as to this I make no finding, would be immaterial, as M. A. Prater did not bind himself to make any particular will, and he had the balance of his lifetime to make a will in accordance with his letter.

"It is therefore ordered and adjudged and decreed that the plaintiffs have failed to make out their case, and that their complaint be, and the same is hereby, dismissed, with cost."

*Messrs. Edwin H. Folk, S. McG. Simpkins* and *Eugene W. Able,* for appellant, cite: *Acceptance of offer by letter makes out the contract:* 3 Pom Eq. 1244; 22 S. C. 468; 73 S. C. 155. *Statutes of fraud do not apply:* 57 S. C. 576. *If plaintiffs establish their claim, specific performance will be decreed:* 22 S. C. 454; 3 Des. 190; 4 Id. 185; 57 S. C. 559; 48 S. C. 86. *Death of party not forming an essential part*

*of consideration will not discharge the contract:* 7 R. I. 589; 22 Me. 531; 71 N. Y. 40; 22 Am. R. 7; 5 Allen 306; 81 Am. Dec. 747; 16 L. R. A. 858. *Law applicable:* 80 Ala. 451; 57 S. C. 72.

*Messrs. Thurmond & Ramage* and *E. L. Asbill,* contra, cite: *What the law requires of plaintiff in°action for specific performance:* 21 S. C. 119; Clark's El. L. 187; Clark's Con. 683; 9 Cyc. 627; Tryon Sp. Per. 165; 1 Des. 250; 2 Hill Ch. 121; 48 S. C. 86; 70 Am. St. R. 834; 167 Fed. R. 47. *Implied conditions in personal contracts:* Harriman on Con. 181; 27 Am. R. 7; 23 N. E. 452; 84 Am. Dec. 578; 30 S. W. 536; Harriman 98, 181; 93 Ill. 475; 77 Pa. St. 328; 43 Ohio St. 537; 7 Pagan Con. 537; 44 Am. St. R. 370; 16 L. R. A. 858; 26 L. R. A. 416, 712; 86 N. C. 566; 2 Strange 266; 31 Am. Dec. 707; 81 Am. Dec. 747; 22 Me. 531; 80 Am. Dec. 821; Shep. Touchstone 180; 68 Am. Dec. 760; 9 Cyc. 632, 633; 27 Am. R. 7; 36 Am. St. R. 642; 38 Am. R. 208; 40 Am. R. 765; 60 Am. R. 38; 57 Am. R. 413; 108 U. S. 342; 96 U. S. 24.

April 5, 1913. The opinion of the Court was delivered by

MR. CHIEF JUSTICE GARY. The facts in this case are fully stated, in the decree of his Honor, the Circuit Judge, which will be reported.

After finding that the contract alleged in the complaint had been established by the testimony, the Circuit Judge says: "The question arises: Have the plaintiffs shown by the greater weight of the evidence, their right to have the contract herein enforced? This involves the answers to the following questions: First, Was M. A. Prater absolved from carrying out the contract, by the death of Drayton Prater, in his lifetime? Second, Did M. A. Prater, by allowing the plaintiff Mary R. Prater to continue to reside with him, and render him personal services after the death of Drayton,

waive his right to declare the contract at an end? Third, If M. A. Prater, by allowing Mary R. Prater to continue to reside with, and serve him after the death of her husband, waived his right to rescind the contract, then who thereafter breached the contract, Mary R. Prater or M. A. Prater now deceased?"

We will, first, consider the question, whether the Circuit Judge erred in ruling, that M. A. Prater was absolved from carrying out the contract, by the death of Drayton Prater in his lifetime?

The exceptions assigning error in this respect are overruled, for the reasons stated in the decree.

The next question for determination is, whether the Circuit Judge erred in ruling, that M. A. Prater, by allowing the plaintiff, Mary R. Prater, to continue to reside with him and render him personal services, after the death of Drayton Prater, did not waive his right to declare the contract at an end?

Mary R. Prater's husband died in August, 1905, and she remained until the 5th of January, 1906, discharging her duties, just as she had done before Drayton Prater died. At no time did M. A. Prater give her any notice, or intimate to her in any manner whatsoever, that he regarded the contract broken by the death of Drayton Prater. The Circuit Judge finds, that "these services were rendered by Mary and accepted by her father-in-law, without any agreement or understanding, other than had been entered into previous to her removal to his home." If M. A. Prater did not intend that the agreement should continue of force, it was his duty within a resonable time after Drayton Prater died, to give her notice of such intention. From August, when he died, until January, when Mary R. Prater left, was certainly an unreasonable time for giving the notice to her.

The exceptions assigning error, to the ruling of the Circuit Judge in this respect, must therefore be sustained.

Having reached this conclusion as to waiver, the next question is, whether the breach of the contract was committed by M. A. Prater or Mary R. Prater, when she left on the 5th of January, 1906?

The principal acts upon which Mary R. Prater relies, to show that she was justified in leaving his service the second time, were committed by him prior to the death of Drayton Prater, in August, 1905; yet when he compelled her and her husband to leave in February, 1905, she immediately requested others to plead with M. A. Prater in their behalf, for the purpose of inducing him to allow her and Drayton to return and resume their labors. M. A. Prater gave his consent, and they immediately returned, Drayton continuing in his employment until he died in August, 1905, and she remaining in his service until she left in January, 1906.

W. D. Hampton, who married a daughter of Mary R. Prater, testified that he had a conversation with M. A. Prater on the 28th of March, 1908, at the instance of Mary R. Prater, who had personally requested him to visit M. A. Prater for the purpose of persuading him to come to terms with her, as she wanted to go back and care for him if allowed to do so.

The fact that Mary R. Prater was very anxious to return both times when she left is strong evidence that the conduct of M. A. Prater was not so objectionable as to prevent her living with him.

If Mary R. Prater was not justified in leaving, on account of the general conduct of M. A. Prater towards her, then there was a breach of contract on her part, as it is not contended that he at that time ordered her to leave.

The exceptions assigning error on the part of the Circuit Judge, in the respect under consideration, are overruled.

These conclusions are without prejudice to the right of Mary R. Prater, to recover reasonable compensation for her services while in the employment of M. A. Prater until the

death of her husband; also, without prejudice to the right of the representatives of Drayton Prater to recover reasonable compensation for his services until his death in August, 1905. *Parker* v. *McComber,* 16 L. R. A. (R. I.) 858.

Judgment affirmed.